**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| CAROLYN S. WENTZEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 09-CV-764-GKF-PJC |
| | ) |
| AT&T UMBRELLA BENEFIT | ) |
| PLAN NO. 1, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Carolyn S. Wentzel ("Wentzel") brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA"), seeking judicial review of the denial of her short-term and long-term benefits claims under the AT&T Umbrella Benefit Plan No. 1.

Wentzel challenges the denial of her short-term benefits claim (#A52501838-0001-01) which relates to her first day of absence on June 30, 2005, and was approved for the period of July 7, 2005, to May 28, 2006, and for August 2 and 3, 2006. The claim was denied for the period of May 29, 2006, through August 1, 2006, and August 4, 2006 through Wentzel's return to work. [AR 495, 618-620].[1]

Wentzel also challenges the denial of her long-term benefits claim, which was denied based on the definition of "Long Term Disability" set forth in the AT&T Disability Income Program. That provision requires fifty-two (52) weeks of short term disability benefits to have been paid before a long term disability period may begin. [AR 236-237].

---

[1] The administrative record ("AR") in this case consists of pages marked 1-785.

The SBC Umbrella Benefit Plan No. 1, now known as the AT&T Umbrella Benefit Plan No. 1, is an employee welfare benefit plan governed by ERISA.  The Umbrella Plan, a comprehensive welfare benefit plan for eligible employees and retirees, combines funded group medical, supplemental group medical, dental, vision, prescription drug, life insurance, short-term and long-term disability, and accidental death and dismemberment plans into one welfare benefit plan.  One of the Umbrella Plan's component plans is the AT&T Disability Income Program (hereinafter referred to as the "Plan").  [AR 712, Dkt. #30-1, Nancy Watts Affid., ¶5].

### I. Plan Terms

The Plan provides short term disability benefits ("STD benefits") and long-term disability benefits ("LTD benefits") to eligible participants who are either employees or former employees of one of the participating companies [AR 7, 27-28].  Southwestern Bell Telephone Company; SWB is a "participating company," and Wentzel, as an employee of SWB, was a qualified participant in the Plan. [AR 7, § 2.7; AR 8, §§ 2.16, 2.17].  Under the Plan, qualified employees may receive up to 52 weeks of STD benefits beginning on the eighth consecutive calendar day of an absence caused by an illness or injury.  [AR 27].

The Plan defines "short term disability" as "the period lasting fifty-two (52) weeks or less for which Benefits under the Plan are payable for a Total or Partial Disability."  [AR 9, § 2.23]. "Total Disability" or "Totally Disabled" means, "with regard to Short Term Disability, that because of an Illness or Injury, an Employee is unable to perform all of the essential functions of his job or another available job assigned by the Participating Company with the same full- or part-time classification for which the Employee is qualified."  [AR 9, § 2.26].

AT&T Inc. (formerly known as SBC Communications Inc.) is the Plan Administrator. [AR 9, 35; Dkt. #30-1, Watts Affid., ¶11].  The Plan provides that AT&T, as the Plan

Administrator, "[has] full power to administer the Plan in all of its details, exclusive of granting and denying of claims, subject to the applicable requirements of law." AR 16, § 5.2.1].  The Plan Administrator has the authority to make and enforce such rules and regulations as it deems necessary or proper for the efficient administration of the Plan.  [AR 16, § 5.2.2(a)].  The Plan states:

> [AT&T] shall appoint a Committee which will consist of not less than three nor more than seven individuals and/or one or more Claims Administrators, the Committee/Claims Administrator(s) each having the administrative responsibilities described below:
>
> 5.4.1     …[E]ach Claims Administrator shall have the specific powers elsewhere herein granted to it or elsewhere granted to it by [AT&T] and shall have such other powers as may be necessary in order to enable it to administer the Plan . . . .
>
> *   *   *
>
> 5.4.5(a)     …[E]ach Claims Administrator. . . *shall grant or deny claims for eligibility and/or for benefits under the Plan,* and authorize disbursements according to the Plan.

[AR 17-18] (emphasis added).

A third-party administrator, Sedgwick Management Claims Services, Inc. ("Sedgwick") began administering disability claims for SWB effective March 2002. [Dkt. #30-1, N. Watts Affid., ¶13].   AT&T subsequently appointed Sedgwick as the Claims Administrator for the Plan, including for claims brought by employees of SWB.   [*Id.*].  Sedgwick has therefore been the Claims Administrator of the Plan continuously since March 2002.  [*Id.*].

Thus, under the terms of the Plan, Sedgwick had discretionary authority to grant or deny the claim at issue in this case.[2]

---

[2] Wentzel argues that AT&T, as the Plan Administrator, had an inherent conflict of interest because AT&T benefits from denying claims.  [Dkt. #20 at 16].  However, the Plan carves out from the Plan Administrator's powers the authority to grant or deny claims. [AR 16, § 5.2.l]. That power is granted, instead, to, *inter alia,* the Claims Administrator—in this case, Sedgwick.  [AR 18, § 5.4.5(a)].

## II. Factual Background

Wentzel was employed by SWB as a service representative at the time of her disability claim. [AR 444]. The position was classified as sedentary. [*Id.*]. As an SWB employee, she was eligible to receive short-term disability benefits under the Plan.

Wentzel made successive short-term disability benefit claims for neck pain with cervical degenerative disc disease; a shoulder injury; gastric bypass surgery; and knee pain. [AR 345].

In June 2005, Wentzel sought treatment from Terrill Simmons, M.D., and orthopedic surgeon, for neck and back pain. [AR 441]. She reported the pain was severe enough that she was unable to work. [*Id.*]. Dr. Simmons recommended an MRI. [*Id*]. After the MRI, Dr. Simmons advised plaintiff that her condition was not severe enough to require surgery and recommended lifestyle changes, including walking around more, better posture, a flat pillow for sleep and anti-inflammatories. [*Id.*].

Wentzel remained off work and applied for short-term disability benefits for the first day of absence, June 29, 2005. [AR 444]. Sedgwick contacted Wentzel's supervisor to confirm Wentzel's first day of absence, the job title and duties. [AR 442]. Sedgwick also contacted Wentzel to discuss the claim information. [AR 444-445]. Sedgwick instructed plaintiff that medical information to substantiate her disability was due by July 14, 2005. [AR 445]. Sedgwick informed Wentzel that claims without medical information supporting a complete inability to perform her assigned job duties by the due date, her claim would be denied. [*Id.*]. Sedgwick also contacted Dr. Simmons' office and requested medical information. [AR 441-442]. Dr. Simmons' office sent results from a cervical MRI dated June 23, 2005. [AR 441].

Based on the information provided, the claim was approved for the period of July 6, 2005, through July 24, 2005. [AR 440-441].

On July 13, 2005, Wentzel reported to Sedgwick that she had reinjured her back. [AR 440]. Sedgwick informed her that her benefits were approved through July 24, 2005. [*Id.*]. Sedgwick requested updated medical information from Dr. Simmons' office, which it received on July 23, 2005. [*Id.*]. MRI results showed degenerative disc disease in her neck and a herniated disk in her back at L5-S1. [AR 439]. Plaintiff's benefits were extended to August 15, 2005. [*Id.*].

On August 10, 2005, Sedgwick telephoned Dr. Simmons' office and left a message requesting updated medical information. [AR 438]. On August 11, 2005, Sedgwick requested clarification of plaintiff's work restrictions, including whether the restrictions were permanent or temporary and whether plaintiff was too disabled to perform her sedentary position or any occupation in general. [AR 436-438]. Sedgwick sent a work capacities checklist for Dr. Simmons to complete by August 18, 2005. [AR 436-437].

On August 12, 2005, Wentzel called Sedgwick and advised that she would not be able to return to work on August 16, 2005 and that her doctor would be on vacation for the week of 8/15/05. [AR 436]. Sedgwick advised Wentzel that updated medical information was needed in order to extend benefits beyond August 15, 2005. [AR 436]. Wentzel stated that she would not have updated medical information until her next office visit on August 22, 2005. [AR 436]. On August 18, 2005, Sedgwick faxed a second Physical Capacities Evaluation ("PCE") form to Dr. Simmons. [AR 434-436].

On August 31, 2005, Sedgwick received the PCE form, dated August 22, 2005, from Dr. Simmons. [AR 433]. Dr. Simmons stated Wentzel had the following permanent restrictions: Sit

one hour during an eight-hour day; no walking; work two hours per day.  [*Id.*]  On September 6, 2005, Sedgwick extended Wentzel's benefits to October 2, 2005.  [AR 283; 433].  Sedgwick called plaintiff and left a voice message notifying her of the extension.  [AR 432-433].

On September 30, 2005, Wentzel called Sedgwick and asked if additional medical information had been received, and was told it had not.  [AR 432].  Wentzel stated she would follow up with her doctor and that she could not return to work on October 3, 2005.  [AR 431-432].  On October 3, 2005, Wentzel again called Sedgwick to check if it had received the medical information from Dr. Simmons.  Sedgwick informed her that it had received a fax from Dr. Simmons' office late in the day on September 30, 2005.  [AR 430].  The new information included Dr. Simmons' notes, dated August 22nd, September 20th, and September 26th.  [AR 426].  The notes reiterated Wentzel's degenerative disk disease, referenced a rotator cuff injury presented on September 26th, discussed possible knee surgery, and noted that Wentzel had applied for Social Security disability benefits on August 22nd.  After review of the additional information, Sedgwick extended plaintiff's benefits to November 2, 2005 [AR 425-426; 625] and left Wentzelt a voice message advising her of the benefit approval.  [AR 424].

Wentzel called on October 24, 2005, and informed Sedgwick she was scheduled for gastric bypass surgery on November 10, 2005, and that she would continue to be off work due to shoulder and back problems.  [AR 423].  She said she would have her doctor fax additional medical information.  [*Id.*].  On October 28, 2005, Sedgwick telephoned Wentzel and left a message requesting the name and telephone number of the doctor performing the gastric bypass surgery as well as records from Dr. Simmons since October 1, 2005, and asking whether Wentzel was in physical therapy and whether she had an MRI of her shoulder.  [AR 423].  Wentzel called back the same day and provided the name and telephone number of Dr. Luis Gorospe, who

would be performing the gastric bypass surgery. [AR 422].  Wentzel stated she was not in physical therapy and had not had an MRI of her shoulder.  [*Id.*].  Sedgwick informed her it needed updated medical information from Dr. Simmons.  [*Id.*].

On November 2, 2005, Sedgwick received medical information from Dr. Simmons relative to an examination of Wentzel's shoulder on October 17th.  Sedgwick called Wentzel on November 2, 2005 and advised her that it was waiting on a callback from Dr. Simmons' office to confirm that she was seen by Dr. Simmons on October 31, as the information from October 17 did not tell much.  [AR 421].  Sedgwick advised her that it would grant an administrative extension to obtain the October 31, 2005 office visit notes but that confirmation of the visit was needed.  [*Id.*].  Wentzel told Sedgwick she had also seen cardiologist Dr. Dobratz due to chest pains and pulmonologist Dr. Brit.  [*Id.*].  Wentzel reported shortness of breath, and stated she was also seeing Dr. Louis for sleep apnea.  [*Id.*].  Sedgwick advised Wentzel that the approval for gastric bypass surgery was six weeks and after that time, she would need records from all physicians treating her for conditions impacting her ability to work.  [*Id.*].  Wentzel stated that the gastric bypass surgery would help with her orthopedic issues and that she hoped to return to work.  [*Id.*].

The following day, Sedgwick contacted Dr. Simmons' office and was informed that the dictation might be ready the next day.  [AR 421-422].  Sedgwick granted a nine-day administrative extension in light of plaintiff's scheduled surgery and the reported orthopedic visit on October 31.  [AR 420].  Sedgwick advised Wentzel by a phone message and by letter that her claim for wage replacement benefits had been extended to November 11, 2005.  [AR 420; 635].

Sedgwick received additional information from Dr. Simmons on November 7, 2005, and reviewed it on November 10, 2005.  [AR 419].  Dr. Simmons noted that during the October 31,

2005, office visit, Wentzel reported she had decided to have gastric bypass surgery and it was scheduled with Dr. Gorospe on November 10, 2005.  [*Id.*].  Sedgwick confirmed the surgery and provided a six-week recovery period.  [AR 418-419].  After review of medical documentation submitted by Wentzel's physician, her claim for wage replacement benefits was approved for the period through December 21, 2005.  [AR 417, 641].

On December 16, 2005, Sedgwick contacted Wentzel and reminded her that her additional medical information was due in five days.  [AR 416].  Wentzel reported that she saw Dr. Simmons on December 3, 2005, and that she was going to physical therapy.  [*Id.*].  Sedgwick contacted the physical therapy office to request information.  [AR 415-416].  Sedgwick reviewed additional information received from Dr. Simmons, including chart notes indicating that plaintiff had received an injection in her knee and was undergoing physical therapy.  [AR 413-415].  Sedgwick approved an extension of wage replacement benefits through January 8, 2006.  [AR 412-413; 656].  On December 21, 2005, Sedgwick notified Wentzel by phone call and by letter of the extension and of the medical documentation due date of January 4, 2006.  [*Id.*].

On January 3, 2006, Sedgwick called Wentzel to remind her of the due date for additional medical information.  [AR 410]. Wentzel stated that she was scheduled to see Dr. Simmons on January 6, 2006, that she had physical therapy twice that week, that she had seen Dr. Gorospe that day and that her blood pressure was 152/94, that she had seen Dr. Sharon Noel on December 30, 2005 for high blood pressure, and that she was to follow up with Dr. Noel in two weeks. [*Id.*].  Sedgwick asked Wentzel to have her physical therapy notes sent to Sedgwick, and called Dr. Noel's office and requested updated medical records.  [*Id.*].  Sedgwick reviewed notes from Dr. Noel and from physical therapy, which indicated Wentzel needed a total knee replacement but first needed to lose weight and be medically stable.  [AR 410].  Based on the additional

information, Sedgwick approved an extension of wage replacement benefits through February 16, 2006. [AR 407-408; 660]. On January 6, 2006, Sedgwick notified Wentzel of the extension. [*Id.*].

On February 10, 2006, Sedgwick contacted Wentzel to advise her that her benefits would expire on February 16, 2006, and if she did not return to work on February 17, 2006, updated medical information would be needed. [AR 407]. Wentzel stated she would not be returning to work on February 17, and that she had been seen that day by Dr. Simmons, who would forward updated information to Sedgwick. [*Id.*]. She advised she did not know when she would return to work, as she would be having a knee replacement after her blood pressure stabilized. [*Id.*]. Sedgwick contacted Dr. Simmons' office and left a message advising that Wentzel's benefit approval would expire on February 16, 2006 and that updated medical information was needed if plaintiff was not going to return to work. [AR 407].

In a letter dated February 13, 2006, Sedgwick advised Wentzel that her short term disability benefits would expire 6/12/2006, and "we believe you may be eligible for long term disability benefits under your disability plan as of 6/13/2006." [AR 157-159]. Sedgwick enclosed a number of forms for Wentzel to complete and return so that it could further evaluate her eligibility for long term benefits. [*Id.*].

On February 16, 2006, Sedgwick called Dr. Simmons' office and faxed a request for medical information. [AR 406]. Sedgwick also called Wentzel and advised her of the expiration of benefit approval and that Sedgwick had requested medical information from Dr. Simmons' office. [*Id.*]. Sedgwick also told Wentzel that Dr. Noel's office needed a signed authorization. [*Id.*]. Wentzel informed Sedgwick she had seen Dr. Noel on February 14 and had an office visit scheduled with Dr. Simmons on February 17. [*Id.*]. Later that day, Wentzel called Sedgwick to

verify that it had received faxes from both doctors; Sedgwick informed her nothing had been received.  [AR 405].  Wentzel said she would follow up with the doctors the next day.  [AR 406].

On February 17, 2006, Sedgwick received and reviewed medical information from Dr. Simmons.  [AR 405].  Dr. Simmons' notes indicated he had seen Wentzel on February 10 and that both her knee and shoulder were flaring up.  [*Id.*].  He had given her a knee injection, and noted that total knee replacement surgery would be performed after plaintiff lost enough weight and was medically stable.  [*Id.*].  Simmons noted that Wentzel was unable to do her sedentary duties of talking/typing at this time due to numerous physical conditions.  After review of the medical documentation, Sedgwick extended her wage replacement benefits through February 26, 2006.  [AR 404-405; 665].

Wentzel called Sedgwick on February 20, 2006, and reported that she had been in the hospital over the weekend due to complications from her gastric bypass surgery.  [AR 403].  The next day, she called to ask if Sedgwick had received her discharge statement; she was informed it had not been.  [AR 401].  Wentzel said she had an office visit scheduled with Dr. Gorospe and Dr. Kirk on March 2, 2006. [*Id.*].

On February 22, 2006, Sedgwick called Wentzel to advise her that medical information was due in five days, and her claim could be placed in denied status if no additional medical information was received to support disability.  [AR 398].  Wentzel said she would have her physician verify the hospital admission.  [*Id.*].  Sedgwick received and reviewed information from Dr. Kirk's office and verified that Wentzel had been admitted to the hospital over the weekend.  [AR 397-398].  Sedgwick determined the medical information showed Wentzel was unable to perform her sedentary duties and approved an extension through March 8, 2006.  [AR 396-397].

Wentzel telephoned Sedgwick on March 2, 2006 and stated she had seen her doctor that day, that she would not be able to return to work on March 9, 2006, because she was to undergo a scope procedure, and that she would make sure her physician faxed additional medical information. [AR 395].  On March 3, 2006,  Sedgwick called plaintiff and left a message advising her that her benefits would expire on March 8, and that she needed to submit updated medical information if she did not return to work on March 9.  [AR 395].  Sedgwick also called Dr. Kirk to request updated medical information to support Wentzel's claim, specifically verifying what procedure had been done and providing an estimated return to work date.  [AR 395].  Plaintiff returned the call to Sedgwick and advised Sedgwick to follow up with Dr. Pond, and that Dr. Kirk would perform the scope, but that she did not yet know the date of the procedure.  [AR 394-395].

Wentzel telephoned again on March 6, 2006, saying she would not be able to return to work on March 9, 2006, and that she would be seeing Dr. Morris, a gastroenterologist, on March 10, 2006.  [AR 394].  On March 8, 2006, Wentzel called again, saying she would not return to work.  [AR 393].  Sedgwick explained that she would have to submit office visit notes from March 2, 2006; Wentzel indicated she understood, and that she would also have information sent regarding the scope scheduled for March 10, 2006.  [Id.]. Sedgwick contacted Wentzel on March 8, 2006, to advise her of the expiration of benefits that date and obtain an estimated return to work date.  [AR 393].  Sedgwick also contacted Dr. Pond's office and requested updated medical information.  [AR 393].

On March 9, 2006, having received none of the requested medical information, Sedgwick performed an eight month review of  Wentzel's case and denied her claim effective March 9 through return to work.  [AR 391-392, 466].  Later that day, Wentzel called Sedgwick to inquire

if additional medical information had been received.  She was advised nothing had been received, and Wentzel said she would follow up with her physician.  [AR 390].  Two hours later that afternoon, Sedgwick received a fax of medical records from Dr. Kirk's office with dates of service of 2-18-06 and 3-2-06.  [AR 383, 384, 389, 390].

On Friday, March 10, 2006, Wentzel called again to check on the status of her claim and Sedgwick advised her it was pending review.  [AR 387].  Wentzel reported she had an office visit that day and would have updated medical sent to the case manager.  [*Id.*].  Later that day, Sedgwick left a message for Wentzel asking her to call about her claim status.  [AR 386-387].  Wentzel called back and Sedgwick advised her that her claim had been denied and that she had 180 days to appeal, or that she could submit additional information.  [AR 386].  Wentzel stated that she would not appeal, that the medical information that had been sent should have had enough information, that she was having a procedure done the following Wednesday, March 15, and that she would not be returning to work.  [*Id.*].

Wentzel called again on March 13, 2006, and Sedgwick advised her again of the denial of continued wage benefits and provided her with information regarding appeal and ERISA rights.  [AR 385].  Wentzel stated she had seen her gastroenterologist, Dr. Morris, on March 10, and that he would be doing an EGD (esophagogastroduodenoscopy – a procedure that visualizes the upper part of the GI tract up to the duodenum) on March 15.  [*Id.*].  The claims representative at Sedgwick advised plaintiff she would check with the assistant business unit manager ("ABUM") to see if Sedgwick could approve a 7-day administrative extension.  [*Id.*]  The ABUM advised that Sedgwick should proceed with denial of the claim, but that Wentzel could submit the medical information from the March 10 office visit and the procedure to see if it supported

continued absence.  [AR 384].  Sedgwick called Wentzel and left a message advising her of its position.  [AR 384].

On March 13, 2006, a Sedgwick supervisor returned the proposed denial letter to the case manager, noting that a document had come in (on March 9) with dates of service of 2-18 and 3-2. The supervisor noted that Sedgwick "cannot deny claim for no ongoing medical."  [AR 384].

On March 14, 2006, Sedgwick reviewed the medical information it had received on March 9, relating to Wentzel's March 2, 2006, office visit.  [AR 383-384].  On March 15, 2006, Sedgwick forwarded the case to a Physician Advisor for review.  [AR 381-383].  The Physician Advisor was asked to consider: (1) what are the employee's physical limitations that preclude her from performing her sedentary job duties; and (2) are there recommended permanent restrictions or limitations appropriate and reasonable for the employee; if not, what would be reasonable and appropriate to allow the employee to return to work?  [AR 381-383].  Sedgwick contacted Dr. Kirk's office to set up a call between Dr. Kirk and the physician advisor.  [AR 383].  Dr. Kirk did not return the call, so the physician advisor performed a file review only.  [AR 381].

On March 17, 2006, Wentzel called Sedgwick to report that her leg and back went out and that she would be going to see her orthopedic doctor, and asking where to send the information from the doctor.  [AR 380-381].  She was advised where to send the information. [*Id.*].

Dr. Barbara Parke, M.D., a board-certified physician in physical medicine and rehabilitation, performed the record review on March 20, 2006.  [AR 378-380].  After review of the file, Dr. Parke found the objective documentation supported that Wentzel was at that time limited in any sustained, consistent activities, and the duration of the limitations would depend on her recovery from gastric bypass and total knee replacement surgery, possibly 2 to 3 months

following the knee surgery.  [AR 380].  Dr. Parke therefore determined that Wentzel was unable

at that time to perform her duties.  Sedgwick extended the short-term disability period to April

23, 2006.  [AR 380, 472].  Sedgwick left a voice message for Wentzel advising of the benefit

approval extension and that her claim would be taken over by Sedgwick's long-term disability

team for continued review.  [AR 374].

On March 30, 2006, Wentzel received a call from her new case manager.  [AR 373-374].

Plaintiff advised that her next office visit to follow up on her gastric bypass status would be on

April 4, and that she would have an injection to her back for pain on April 24. [*Id.*].  Sedgwick

asked her when she planned to have the total knee replacement, and Wentzel advised she was not

sure and Dr. Simmons had told her she needed to be fully recovered from her gastric bypass

surgery before the knee replacement could be done.  [*Id.*].  The case manager reminded Wentzel

that additional medical information was due by April 17 to evaluate continued eligibility for

short-term disability benefits.  [*Id.*].

On April 19, 2006, Sedgwick contacted Wentzel to confirm that short term disability

benefits would expire on April 23, 2006, and that updated medical was needed to consider

payments beyond that date.  [AR 373].  Wentzel stated she had seen her doctors and would

contact their offices to make sure the latest medical information was sent.  [*Id.*].  On April 21,

2006, Sedgwick left a voice message for Wentzel advising her that it had received information

from Dr. Noel but nothing from Dr. Pond or Dr. Simmons.  [AR 372].

On April 24, 2006, Sedgwick reviewed medical information received from Drs. Noel and

Morris and, based on the additional information, approved short term disability benefits through

May 15, 2006.  [AR 370-371].

On May 5, 2006, Sedgwick faxed a request to Dr. Simmons for all office visit notes since February 10, 2006, copies of plaintiff's last right knee X-ray and/or MRI reports and comments on current restrictions and limitations. [AR 368].  On May 11, 2006, Sedgwick left Wentzel a voice message reminding her of the medical due date and advising her that Dr. Simmons had not responded to its faxed request for medical information.  [AR 367-368].  Sedgwick advised her that if medical information was not received, the claim would be placed on denied status.  [AR 368].  Sedgwick also left a voice mail message for Dr. Simmons to advise him of the medical due date of May 15, 2006.  [AR 367].

Wentzel called Sedgwick on May 12, 2006, and stated she would follow up with Dr. Simmons.  [AR 366].  She asked if Sedgwick had received medical information for Dr. Noel, and Sedgwick responded that the last medical was from April 2006.  [*Id.*].  Wentzel stated that she had seen Dr. Noel on May 9, 2006, that Dr. Noel did an EKG in the office, which was abnormal, so he was referring her to another doctor for additional testing.  [*Id.*].

On May 12, 2006, Sedgwick contacted Dr. Noel's office to get a copy of the last office visit note of May 9, 2006, and plaintiff's EKG results. [AR 365-366].  Dr. Noel's office said that the EKG was within normal limits and that plaintiff was now complaining of right hand numbness which had nothing to do with EKG or cardiac testing.  Dr. Noel referred Wentzel to a Dr. Annie Venugopal for an EMG due to the right hand numbness.  [*Id.*].  Also on May 12, Dr. Simmons' office called stating the medical information for Wentzel had been faxed on May 8, 2006; Sedgwick advised it had not received the information, and Dr. Simmons' office indicated it would be re-faxed.  [AR 365].

On May 15, 2006, Sedgwick reviewed the medical information it had received, which included information from Dr. Simmons and Dr. Noel.  [AR 359-362].  Sedgwick left a voice

message with Dr. Simmons' office requesting objective medical information and updated restrictions and limitations; specifically, although Sedgwick had received a fax with chart notes, it had not received an interpretation report for the most recent X-ray or MRI of the right knee which would document Wentzel's degenerative disease.  [AR 359].  Sedgwick stated that "a chart note say[ing] that knee is flaring up is not obj evid of TD." [*Id.*].  Sedgwick again requested restrictions or limitations and explained that the restrictions and limitations that were sent, which dated back to March 21, 2005, were outdated.  [*Id.*]. Sedgwick approved an administrative extension of the benefit approval for 11 days, until May 26, 2006, to allow receipt of additional medical information and for referral to a Physician Advisor for restrictions and limitations.  [AR 356-357, 289; 286].

Sedgwick spoke with Dr. Simmons' office on May 16, 2006, and again asked for diagnostics for the right knee and left shoulder.  [AR 356-357].  Dr. Simmons' office informed Sedgwick that in December 2005, Dr. Simmons had noted that plaintiff would eventually need a total knee replacement, but that it was not scheduled or planned in the near future.  [*Id.*].  Dr. Simmons' office indicated it would send something on the last X-ray performed.  [*Id.*].

On May 19, 2006, Sedgwick called Dr. Simmons' office and left a message that it still needed the shoulder MRI and the doctor's dictation regarding the right knee x-ray findings. Sedgwick then telephoned Wentzel and advised her that the benefit extension would expire May 26, 2006, and that it was still following up on the shoulder MRI and right knee X-rays to substantiate her condition.  [AR 355].  On May 22, 2006, Sedgwick called Dr. Simmons' office late in the afternoon, and it was closed.  [AR 355].  On May 23, 2006, Wentzel called Sedgwick and was advised it needed MRI and X-ray results from Dr. Simmons' office; Wentzel said she would follow up with the doctor's office.  [AR 354].

On May 24, 2006, Wentzel called Sedgwick and asked if it had received the additional medical information from Dr. Simmons; Sedgwick advised that it had not been received, that the claim was being referred to a Physician Advisor for assessment, and that there was no objective medical evidence to support severity of her right knee complaints.  [AR 353-354].  Wentzel said that she had gone to the emergency room on May 23, 2006, for stomach pain, a CT scan was normal and they said she had a spastic colon.  [*Id.*].  Sedgwick told her there would be a decision on her continued eligibility after the Physician Advisor review.  [*Id.*].

Later that day, Sedgwick referred Wetzel's file to a Physician Advisor for review.  [AR 350-353].  The Physician Advisor was asked:  (1) based on your review, is there objective medical evidence to support Wentzel's inability to perform duties of her sedentary occupation with or without accommodation? (2) if restrictions or limitations exist, elaborate and provide the duration of the restrictions or limitations; and (3) if Wentzel is unable to perform the duties of her sedentary occupation, does the medical support with a high degree of certainty that she will improve sufficiently to return to work by December 12, 2006?  [AR 353].

On May 25, 2006, Sedgwick received from Wentzel generic hospital discharge instructions she was given on May 23, 2006, when she went to the emergency room for stomach pain.  [AR 349].  The information provided no clinical data.  [*Id.*].

The Physician Advisor, Dr. David Hinkamp reviewed Wentzel's file and found that Wentzel was "limited in her ambulation and lifting, but has recovered from her gastric bypass and shoulder and knee surgery are not planned.  At this time, there is insufficient objective medical evidence of an inability to perform sedentary work full time, during the review period 5/24/06-ongoing."  [AR 348].   He found that "sedentary work is appropriate."  [AR 347].

On May 26, 2006, Sedgwick called Wentzel to advise that according to the Physician Advisor review there was insufficient evidence to support an inability to perform sedentary work duties due to right knee or shoulder complaints.  [AR 345].  Sedgwick extended the benefits through the weekend to May 28, 2006, to give Wentzel the opportunity to return to work without gaps in time.  [*Id.*].  She was advised that if she did not return to work the week of May 29, 2006, the claim would be terminated.  [*Id.*].

On June 1, 2006, Wentzel called to ask if Sedgwick had received additional medical information.  [AR 343].  Sedgwick advised it had not, and Wentzel said she would contact her medical provider as soon as possible.  [*Id.*].  Wentzel did not return to work.  By letter dated June 9, 2006, Sedgwick informed Wentzel her request for payment of short term disability benefits was denied effective May 29, 2006.  [AR 337-341; 498-500].  The letter provided instructions on what to do to appeal the determination.  [*Id.*].

In a letter dated June 22, 2006, and addressed "TO WHOM IT MAY CONCERN," Dr. Simmons described Wentzel's medical history with him and stated, in pertinent part:

> At this stage, Ms. Wentzel has been and remains disabled since December 2005 . . . The combination of arthritic changes to her neck and her back as well as being able to use her knees in a normal fashion have made her, in my opinion, totally disabled.  . . . At this stage she is ambulatory with the use of a cane, but she has pain.  She is unable to walk more than 100 feet without stopping. She has grinding, swelling and tenderness of the knee joint and pain with standing.  She could do a totally sedentary vocation concerning her knees if she did not have the problems related to her cervical and her lumbar spine which produce pain with long-term sitting."

[AR 508-509].

Wentzel timely appealed the denial of her claim.  Sedgwick received her appeal request on July 6, 2006.  [AR 335, 670].  As part of the appeals process, Sedgwick undertook a review of

Wentzel's medical information.  [AR 334-335].  Sedgwick telephoned Wentzel twice on July 12, 2006, and left messages concerning the appeal process.  [AR 333].

On July 13, 2006, Sedgwick spoke to Wentzel and advised her that under ERISA, Sedgwick had 45 days to make a determination, that the determination would be final, that she had the right to sue under ERISA, that the medical record would be reviewed and that she could submit additional medical information and Sedgwick would review it.  [AR 332].  Wentzel indicated she understood, said she did not start physical therapy until after May 29, 2006, and would submit that information; Sedgwick told Wentzel the medical due date was July 25, 2006.  [*Id.*].  On July 20, 2006, Sedgwick telephoned Wentzel and reminded her the medical due date was July 25, 2006.  [AR 332]. Wentzel indicated she had faxed medical records on July 19, 2006.  [*Id.*].  Sedgwick received and reviewed the medical information, and called Wentzel on July 25, 2006, reminding her that medical due date was that day.  [AR 328-332]. Wentzel stated that she was going to have another procedure and another facet block on August 2, 2006, and Sedgwick agreed to give her additional time to submit medical information and toll her claim to August 14, 2006.  [AR 327-329, 291].

On August 9, 2006, Sedgwick contacted Wentzel and reminded her that the medical due date was August 14, 2006.  [AR 327].  Sedgwick received additional medical information on August 11, 2006 and reviewed it.  [AR 326-327].  On August 14, 2006, Sedgwick left a voice mail message for Wentzel reminding her that the medical information was due that day and advising her it had reviewed medical information already submitted, and if she had more medical information to submit but could not do so by the end of the day, that she should call Sedgwick no later than August 16, 2006, to request additional time.  [AR 325-326].  Wentzel called Sedgwick on August 14, 2006, said she would be submitting more information and needed one more week

to do so.  [AR 325].  Sedgwick called her and advised it would toll her claim to September 5, 2006.  [AR 325; 276].

On August 14, 2006, Sedgwick received information regarding Wentzel's physical therapy and on August 25, 2006, it received information from the same date, indicating Wentzel had a facet block procedure on August 2, 2006.  [AR 322-325].  Sedgwick determined that the medical information submitted supported the conclusion that Wentzel was unable to perform her sedentary job duties on August 2 and 3, 2006, because she required recovery from the facet block procedure. [AR 322-323].  Sedgwick contacted her and advised that her benefits for August 2 and 3, 2006, would be reinstated based on the medical information.  [AR 322].  Wentzel stated that she was having a heart catheterization on September 11, 2006. [*Id.*].  Sedgwick agreed to toll her claim, with a new medical due date of September 26, 2006, but advised her that it might not be able to toll the claim beyond this point.  [*Id.*].  A letter was sent confirming the tolling period. [AR 319-320; 322; 576].

On September 5, 2006, Wentzel advised Sedgwick that she had retained an attorney. [AR 320].  The attorney's legal assistant requested another tolling period through October 24, 2006, which was granted. [AR 319; 295-298; 579].  At this point, Wentzel's claim had been tolled since July 25, 2006.  [AR 319].

On October 19, 2006, Sedgwick contacted Wentzel's attorney's office and reviewed that the medical due date was October 24, 2006.  [AR 317].  The attorney's office indicated he might need more time and asked Sedgwick to follow up again on October 24, 2006.  [*Id.*].

On October 23, 2006, Sedgwick received additional information from the attorney's office with a Medical Source Statement of Ability to do Work-Related Activities (Physical) from Dr. Simmons dated September 14, 2006.  [AR 316-317; AR 302-306].  In that statement, Dr.

Simmons opined that within certain parameters, Wenzel would be able to perform her sedentary job on a sustained and continuing basis (eight hours per day, five days per week).  [AR 304]. Specifically, Simmons opined that Wentzel could sit for 45 minutes to one hour at a time, and less than about six hours in an eight-hour workday.  [AR 303].  The doctor stated that after these time limits, she would need to stand, stretch or lie down for 20-30 minutes before she could begin sitting again.  [*Id.*].   Additionally, she was limited in pushing/pulling in her lower extremities due to the fact that she was waiting a total knee replacement; that she should never climb, balance, kneel, crouch, crawl or bend; and that she had a "moderate" impairment in reaching due to back pain. [AR 304-305].  She had no limitation in her handling, fingering and feeling functions.  [AR 305].

Sedgwick reviewed the information on October 24, 2006, then placed a call to the attorney's office inquiring if more information would be submitted and stating that if Wentzel was unable to submit that day, to call no later than the end of business October 26, 2006, to request additional time.  [AR 316].  Sedgwick advised that if it did not speak with the attorney's office by October 26, 2006, it would proceed with the next step in the process on October 27, 2006.  [*Id.*].  By October 27, Sedgwick had not received any request from the attorney for additional tolling, and it proceeded to forward Wentzel's file for review by specialists in gastroenterology, physical medicine and rehabilitation, cardiology, orthopedics, psychiatry and internal medicine.  [AR 316].

Wentzel's file was reviewed by six different specialists:  Manoj Mehta, M.D., gastroenterology; Saad Al-Shathir, M.D., physical medicine and rehabilitation; Jose Perez, Jr., M.D., internal medicine; Hitesh Patel, M.D., cardiology; Marcus Goldman, M.D., psychiatry; and Richard Silver, M.D., orthopedic surgeon.  [AR 315].  Sedgwick received the Independent

Physician Advisor report on November 7, 2006.  [AR 315; 593-617].  Each of the six specialists found that Wentzel was not disabled and there was no evidence of conditions that would prevent plaintiff from performing her sedentary job duties.  [AR 593-617].

Dr. Mehta, who is board certified in gastroenterology and internal medicine, found that Wentzel would not be considered disabled between 5/29/06 through 8/01/06 and 8/04/06 through the date of his opinion based on any objectively documented gastrointestinal disease.  [AR 594].  He found that she would be disabled during a standard timeframe after her gastric bypass surgery as expected only for a reasonable period of recovery. [*Id.*].  He noted she "did have morbid obesity and underwent a bariatric surgery and recovered with some fairly typical postoperative symptoms," but "objective information recording any specific inability to function was not evident." [AR 595].

Dr. Al-Shathir, who is board-certified in physical medicine and rehabilitation, found there was no documented significant loss of range of motion of plaintiff's spine or knees or evidence of neurological deficits.  [AR 596-598].  He concluded, based on his review of the record, that Wentzel was not disabled from a physical medicine and rehabilitation perspective from her sedentary job as of 5/29/06 through 8/1/6 and from 8/4/06 through the date of his report.  [AR 597].  He noted, however, "complicating factors/comorbitities are obesity and arthritic spine and right knee." [*Id.*].  Referencing the September 14, 2006, statement of ability to work completed by Dr. Simmons, he stated:

> Total disabilit[y] is not supported since it is reported that she can sit less than 6 hours during 8 hours time, can sit 45 minutes to 1 hour without standing or walking and her hands function are unlimited.  **This would indicate that the claimant would have the ability to do a sedentary job with changing in position as desired.**

[AR 598] (emphasis added).

Dr. Perez, who is board-certified in internal medicine, found that there was no evidence that Wentzel's hypertension, hyperlipidemia and diabetes mellitus were of such severity that they would have prevented plaintiff from performing her job duties during the relevant period. [AR 599-603].  He found that from an internal medicine perspective plaintiff was not disabled form her regular job for the period of May 29, 2006, through August 1, 2006, and from August 4, 2006, to the date of his report.  [AR 602-603].  He deferred to other specialists reviewing the file to make a determination on whether Wentzel was disabled from an orthopedic, physiatrist, psychiatric or cardiac point of view.  [AR 602].

Dr. Patel, a cardiovascular specialist, found that there was no evidence of a cardiac illness of such severity that it would have prevented Wentzel from performing her job duties during the relevant period.  [AR 604-607].  He concluded that Wentzel was not disabled from a cardiology perspective and was not disabled from her regular job.  [AR 606].

Dr. Goldman, who is board certified in psychiatry and neurology, observed that "[b]ased on a page-by-page review of this dense large chart, it should be noted that the overall percentage of mental health data is tiny relative to the overall size of the chart;" there were no dedicated mental health notes; and depression and anxiety were mentioned only briefly and were subjective complaints offered by Wentzel.  [AR 613].  He stated that there was no data detailing any loss of global functionality, cognitive dysfunction, severe psychopathology, psychiatric acuity, severity, or a major mental illness or disorder for which functionality or work would be precluded.  [AR 613]. Further, "[t]he data do not adequately establish the presence of a major DSM affective, anxiety or psychotic disorder for which work or functionality would be precluded."  [*Id.*].

Dr. Silver, who is board certified in orthopedic surgery, found that Wentzel had no documentation of any marked loss of range of motion and no documentation of any loss of

functionality of the cervical spine.  [AR 616].  He stated there were no focal neurological deficits in the upper extremities bilaterally and no loss of functionality of the right or left upper extremity.  [*Id.*].  Additionally, he found no documentation of any loss of range of motion of any significance or of loss of functionality of the lumbrosacral spine.  [*Id.*].  He stated that Wentzel's left total knee replacement "has done well" and her right knee has no documentation of any loss of functionality.  [*Id.*].  He stated that "[t]here has been documentation of severe bone on bone degenerative osteoarthritis and that Ms. Wentzel needs a cane to walk a 100 feet, but does have crepitus and grinding, but she can do so."  [*Id.*]. He concluded based on his review of the medical records that Wentzel's "subjective complaints are not substantiated by objective clinical findings that would preclude her from being gainfully employed in a sedentary capacity during the timeframe in question." [*Id.*].

On November 8, 2006, Sedgwick notified Wentzel's attorney of its decision on Wentzel's appeal.  Benefits were approved for the two-day period from August 2, 2006, through August 3, 2006.  [AR 619].   However, Sedgwick upheld the denial of benefits for the periods of May 29, 2006 through August 1, 2006 and August 4, 2006 to Wentzel's return to work date, finding that although some findings were referenced, none were documented to be so severe as to prevent Wentzel from performing the duties of her job as a Service Representative, with or without reasonable accommodation, for those periods.  [AR 620].  Wentzel's attorney was notified of the decision by telephone and letter.  [AR 308-311, 314].

Wentzel also requested payment of long-term disability benefits.  The Plan defines "Long Term Disability" as "the period, immediately following a period of fifty-two (52) weeks for which Short Term Disability Benefits have been paid, for which Long Term Disability Benefits

are payable under the Plan for a Total Disability." [AR 8, Plan, § 2.13].  On June 2, 2006,

Sedgwick denied Wentzel's request for long-term disability benefits, explaining:

> Your claim for Short Term Disability (STD) was terminated effective May 29, 2006, due to denial of your STD benefits. This was prior to completion of the 52 week waiting period.  Since you did not complete the full 52 week period for which short term disability benefits were payable under the [Plan], you do not meet the above plan provisions and your claim for LTD benefits has been denied.

[AR 216].  Wentzel appealed the decision to deny her long-term benefits on November 29, 2006.

[AR 233].[3]  The appeal was denied on December 1, 2006.  [AR 231].

Throughout the time Wentzel received short term disability benefits, Sedgwick

periodically sent her SWB supervisor Disability Benefit Approval Notices which updated the

claim status.  [See, *e.g.,* AR  626].  The notices included a "[b]est estimated return to work full

time full duty date." [*Id.*].  A notice dated 10/11/2005 had a return to work date of 07/25/2005

[sic] [*Id.*].  A notice dated 11/03/2005 listed the return to work date as "unknown." [AR 632].   A

notice dated 11/14/2005 listed the return to work date as 03/06/06. [AR 638]. A notice dated

1/06/2006 listed the return to work date as 03/02/2005 [sic].  [AR 662].  Notices dated 02/17/06,

02/22/2006 and 03/24/2006 listed the return to work date as 05/01/2006 [AR 458, 463, 469].

### III.  Standard of Review

When—as here—the ERISA plan document grants an administrator discretionary

authority to determine eligibility for benefits, to construe the terms of the plan and/or to

determine whether claims should be granted, the court's review is limited to determining if the

decision was arbitrary or capricious.  *LaAsmar v. Phelps Dodge Corporation Life, Accidental*

*Death & Dismemberment and Dependent Life Insurance Plan,* 605 F.3d 789, 796 (10th Cir.

2010);  *Chambers v. Family Health Plan Corporation,* 100 F.3d 818, 825 (10th Cir. 1996);

---

[3] Wentzel initially appealed the decision to deny long-term benefits on July 6, 2006, but later rescinded that request on July 12, 2006.  [AR 224-229].  On November 29, 2006, her attorney again appealed the decision.  [AR 233].

*Sandoval v. Aetna Life and Casualty Insurance Co.,* 967 F.2d 377, 380 (10th Cir. 1992).  Under this standard, "[t]he Administrator['s] decision need not be the only logical one nor even the best one.  It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious."  *Kimber v. Thiokol Corp.,* 196 F.3d 1092, 1098 (10th Cir. 1999), quoting *Woolsey v. Marion Laboratories, Inc.,* 934 F.2d 1452, 1460 (10th Cir. 1991).  The decision will be upheld unless it is not grounded on *any* reasonable basis.  *Id.*

The reviewing court "need only assure that the administrator's decision fall[s] somewhere on a continuum of reasonableness—even if on the low end."  *Id.*  Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary.  *Hancock v. Metropolitan Life Ins. Co.,* 590 F.3d 1141, 1155 (10th Cir. 2009).  "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker.  It requires more than a scintilla but less than a preponderance."  *Rekstad v. U.S. Bancorp,* 451 F.3d 1114, 1119-20 (10th Cir. 2006) (citations omitted).  In determining whether the evidence in support of the administrator's decision is substantial, the court must take into account whatever in the record fairly detracts from its weight.  *Id.* at 1120.  However, "substantiality of the evidence is based upon the record as a whole."  *Id.*

In determining whether the plan administrator's decision was arbitrary and capricious, the district court must make its decision based upon the arguments and evidence before the plan administrator at the time the administrator made its decision to deny benefits.  *Sandoval,* 967 F.3d at 381.

## IV. Analysis

### A. Denial of Benefits Decision

Wentzel argues AT&T arbitrarily and capriciously selected a date it wanted Wentzel to return to work—May 1, 2006—and terminated her benefits shortly after that date in spite of "overwhelming evidence" showing she could not return to work.  In support of her contention that AT&T acted arbitrarily and capriciously Wentzel points to:  (1) disorganization of the Administrative Record; (2) Disability Benefit Approval Notices that, starting February 17, 2006, set an estimated return to work date of May 1, 2006; (3) Sedgwick's February 13, 2006, letter advising Wentzel she might be eligible for long term benefits; (4) Sedgwick's May 26, 2006 referral of Wentzel's file to a Physician Advisor for review; and (5) Sedgwick's decision to allow benefits for August 2-3, 2006, when Wentzel had the facet block procedure.

As previously noted, under the terms of the AT&T Plan, in order for Wentzel to be deemed disabled and eligible for short-term disability benefits, she was required to demonstrate that because of an illness or injury, she was "unable to perform all of the essential functions of her job or another available job assigned by the Participating Company with the same full- or part-time classification for which [she] is qualified."  [AR 9].

Wentzel's claim for short term disability benefits was initially approved for the period of July 7, 2005, through July 24, 2005.  [AR 440-441].  Successively, after that period, she was approved for extension of  benefits 11 times, through May 28, 2006, and for the period of August 2-3, 2006.  At one point, on March 10, 2006, Sedgwick denied Wentzel's claim based on lack of supporting medical information.  After internal review and review by a Physician Advisor, however, Sedgwick reversed its decision on March 20, 2006.

The May 26, 2006, decision to terminate Wentzel's benefits effective May 29, 2006, was supported by the Claims Administrator's review of medical records and the review performed by the Physician Advisor, Dr. Hinkamp.  Dr. Hinkamp found that although Wentzel was limited in her ambulation and lifting, she had recovered from her gastric bypass surgery, and shoulder and knee surgery were not planned.  He concluded there was insufficient objective medical evidence of an inability to perform sedentary work full time.  [AR 345-348].

Wentzel's assertion that Sedgwick covertly schemed to terminate her short term benefits by May 1, 2006, is not supported by the record.  The Disability Approval Notices sent to Wentzel's SWB supervisor were clearly intended to keep the supervisor updated about when Wentzel might return to work, and changes and inconsistencies in those dates cannot fairly be read to evidence a scheme of any sort.

Nor does a review of the record support Wentzel's conspiracy theory.  Her benefits were *not* terminated on May 1, 2006.  Sedgwick always clearly advised Wentzel of the dates her benefits were approved for, it consistently called her and reminded her when benefits were set to expire and asked for more medical information; and the benefits dates were repeatedly extended based on her medical records.  Additionally, the record supports that Sedgwick handled her eligibility reviews in a proper manner.  The May 26, 2006, denial determination was prompted by Wentzel's failure to submit adequate supporting medical records.

Sedgwick repeatedly, and unsuccessfully, attempted to obtain current medical records from Dr. Simmons before making the May 26, 2006, decision.  During May 2006, Sedgwick contacted Dr. Simmons' office five times asking for additional information, and prior to the denial of the claim for benefits, Sedgwick explained to both Wentzel and Dr. Simmons' office that if additional medical information was not received in a timely fashion, Wentzel's claim for

benefits may be denied.  [AR 367-368].  And Sedgwick's referral of the file to a Physician Advisor was consistent with its treatment of the March 10, 2006, denial.

Likewise, the February 13, 2006, letter concerning Wentzel's potential eligibility for long term benefits lends no credence to Wentzel's argument that Sedgwick acted arbitrarily and capriciously in subsequently terminating her short term disability benefits.  The letter simply advised Wentzel she was *potentially* eligible for long term disability and provided forms for her to complete.

Finally, the court rejects Wentzel's argument that the decision to allow benefits for the two-day period (August 2-3, 2006) involving Wentzel's facet block procedure supports a conclusion that Sedgwick's May 26, 2006, denial was arbitrary and capricious.  The record demonstrates the decision to grant benefits for that period was based on a review of the medical records which led Sedgwick to conclude the procedure and recovery period required two days.  It does not—as Wentzel suggests—support a conclusion that she was totally disabled for the entire period before and after the procedure.

Finally, the imperfect organization of the Administrative Record does not lead the court to conclude that Sedgwick acted arbitrarily and capriciously.  In the court's experience, administrative records in ERISA cases are seldom models of organization.

### B. Appeals Process

Wentzel contends the independent physician opinions obtained by Sedgwick during the appeals process did not "cure the fact that the decision to terminate Ms. Wentzel's benefits was arbitrary and capricious." [Dkt. #20 at 18].  Principally, she argues that each of the six physicians opined only as to his or her own specialty and none reviewed Wentzel's ailments globally.

Each of the six independent physicians reviewed all of Wentzel's records.  Each reached the conclusion that she was not totally disabled and that the medical records did not contain medical information and data demonstrating a functional limitation precluding her from performing a sedentary level of physical exertion as described in her essential job duties.  Their opinions were based on substantial evidence in the medical records and were reasonable.  The fact that none offered a single global opinion does not render the process arbitrary and capricious.

Wentzel also argues that Dr. Al-Shathir misrepresented Dr. Simmons' statements in the September 14, 2006 statement of ability to return to work.  The court disagrees.  In his statement, Dr. Simmons opined that with certain limitations, including taking breaks from sitting, Wentzel could perform her sedentary job.  [AR 302-306]. Dr. Al-Shathir's conclusion that the September 14 statement "would indicate that the claimant would have the ability to do a sedentary job with changing in position as desired,"  neither misrepresents the record nor is  unreasonable.

The court concludes that Sedgwick's decision on appeal was reasonable and supported by substantial evidence.

**C. Whether the Record Contains Substantial Evidence Supporting Sedgwick's Decision**

Wentzel argues the record as a whole does not contain substantial evidence supporting the administrator's decision.  She points to the fact that she is morbidly obese.  She is 5'-4" tall and, before her gastric bypass operation weighed 370 pounds.  Although she lost a significant amount of weight after the surgery, in June 2006 she still weighed 295 pounds.  The medical records show that many of her physical problems were caused or exacerbated by her obesity, and Wentzel argues the administrator knew she needed a total knee replacement, but terminated her short term disability benefits before the surgery was performed.

The court agrees that, based on evidence in the record, Sedgwick *could* have concluded Wentzel was totally disabled.  However, the applicable standard of review is whether there was *any* reasonable basis for Sedgwick's decision, and not whether it was the only logical decision or even the best one.  *See Kimber,* 196 F.3d at 1098.   Sedgwick's decision that Wentzel was not disabled was *not* unreasonable.  The record as a whole provides substantial evidence supporting the administrator's denial of benefits, including the lack of medical information supporting a claim of total disability as of May 29, 2006, the opinions of the six independent physicians and Dr. Simmons' opinion of September 14, 2006, that, with restrictions, Wentzel could perform the duties of her sedentary job.

## V. Conclusion

For the reasons set forth above, the court affirms defendant's decision denying Wentzel's short-term and long-term disability benefits claims.

ENTERED this 29th day of March, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT